1

2

3

4

5                   **UNITED STATES DISTRICT COURT**

6                   **EASTERN DISTRICT OF CALIFORNIA**

7

8    VALERIE A. NINO,                        CASE NO. 1:13-CV-832 GSA

9                    Plaintiff,

10           v.                              ORDER REGARDING PLAINTIFF'S
                                             SOCIAL SECURITY COMPLAINT
11   CAROLYN W. COLVIN,[1] Acting
     Commissioner of Social Security,
12
                     Defendant.
13

14

15                        **INTRODUCTION**

16          Plaintiff Valerie A. Nino ("Plaintiff") seeks judicial review of a final decision of the

17   Commissioner of Social Security ("Commissioner" or "Defendant") denying her applications for

18   Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental

19   Security Income payments under Title XVI of the Social Security Act.  The matter is pending

20   before the Court on the parties' briefs, which were submitted, without oral argument, to the

21   Honorable Gary S. Austin, United States Magistrate Judge.[2]

22   ///

23   ///

24   ///

25   _____

26   [1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule
     25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant
27   in this action.

     [2] The parties consented to the jurisdiction of a United States Magistrate Judge.  *See* Docs. 5 & 7.
28

## SUMMARY OF THE ADMINISTRATIVE PROCEEDINGS

On June 23, 2009,[3] Plaintiff filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income benefits, both alleging disability beginning on April 2, 2005. AR 194-203, 204-207.  Her claims were denied initially on January 25, 2010 and upon reconsideration on June 17, 2010.  AR 64-83, 84-100, 101-109, 110-118.  On September 1, 2011, an administrative law judge ("ALJ") conducted a hearing on Plaintiff's claim. AR 36. Plaintiff was represented by an attorney and testified at the hearing. AR 36-63.  A vocational expert ("VE") also appeared and testified. AR 36-63. In a decision dated September 16, 2011, the ALJ found that Plaintiff was not disabled. AR 17-35. Applying the 5-step sequential disability determination analysis, the ALJ noted that Plaintiff's impairments of bipolar I disorder, anxiety, and polysubstance dependence in remission constituted more than minimal limitations on her ability to perform basic work activities. AR 22. However, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels on a full-time basis, subject to certain non-exertional limitations.  Specifically the ALJ found that Plaintiff was limited to simple and routine tasks with only occasional contact with coworkers, supervisors, and the public. AR 24. Finally, the ALJ determined that there were a significant number of jobs in the regional and national economies that Plaintiff could perform.

On April 3, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. AR 1-6. Plaintiff then commenced this action in District Court. Doc. 1.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether (1) it is supported by substantial evidence and (2) it applies the correct legal standards. *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).

"Substantial evidence means more than a scintilla but less than a preponderance." *Thomas*

---

[3] The date of application is unclear but Plaintiff states that the application date is June 23, 2009. AR 194-203, 204-207; Doc. 15, 1:23.

1   *v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  It is "relevant evidence which, considering the

2   record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Id.*

3   Where the evidence is susceptible to more than one rational interpretation, one of which supports

4   the ALJ's decision, the ALJ's conclusion must be upheld."  *Id.*

5                          **ISSUES PRESENTED FOR REVIEW**

6           The Plaintiff raises three issues in the instant appeal.  First, the Plaintiff argues that the

7   ALJ improperly rejected the opinions of the consultative examiner Dr. William Prince, Psy.D. and

8   Dr. Les P. Kalman, M.D., a psychiatrist who examined her for purposes of her benefits

9   application. Doc. 15, 11:18-22; AR 26-27, 535-540, 1013-1021. Second, the Plaintiff argues that

10  the ALJ erred in relying on the VE's testimony regarding jobs that Plaintiff could perform because

11  the VE misstated the DOT numbers associated with particular jobs. Doc. 15, 11:24-25, 15:16-19;

12  AR 28. Finally, the Plaintiff argues that the ALJ did not give legally sufficient reasons for

13  discounting her subjective symptom testimony. Doc. 15, 15:21-22; AR 27. The Commissioner

14  responds that the ALJ properly rejected the opinions of Drs. Prince and Kalman, properly relied on

15  the VE's testimony because the errors in the VE's testimony were harmless, and properly

16  evaluated Plaintiff's credibility. Doc. 16, 5:7-15, 5:23-24, 9:1, 11:20-21.

17              **SUMMARY OF THE MEDICAL EVIDENCE IN THE RECORD**

18          The Plaintiff alleged disability beginning April 2, 2005. AR 194-203, 204-207. The ALJ

19  exhaustively summarized Plaintiff's medical history, specifically regarding her psychological

20  impairments. AR 25-27. Plaintiff had a history of methamphetamine dependence, alcohol

21  dependence, and marijuana abuse but testified that she had been sober since August 2009.  AR 52,

22  584.  Plaintiff had received mental health treatment at San Juan Health Center and through Tulare

23  County Health and Human Services ("TCHHS") for depression, anxiety, and mood swings.

24  However, Plaintiff had never been hospitalized for psychiatric problems.  AR 25, 395.

25          In July 2008, Plaintiff began to see Dr. Edgar Castillo, M.D., a psychiatrist at San Juan

26  Health Center, who diagnosed her with bipolar disorder ("working diagnosis") and prescribed

27

28

1    medication.[4] AR 365-373. Plaintiff saw Dr. Castillo twice a month from July through September

2    2008 and once in November 2008, when she reported doing "much better." AR 365-373.

3    Thereafter, Plaintiff next saw Dr. Castillo on March 24, 2009, when she wanted to get back on her

4    medications after giving birth to a child. AR 384. From March 2009 through September 2009,

5    Plaintiff's saw Dr. Castillo approximately once a month. AR 362-365, 380-388. Dr. Castillo's

6    notes for her April 2009 appointment indicate that her mood swings had abated, her depression

7    had improved, and her anxiety attacks had diminished significantly. AR 363. In June 2009, Dr.

8    Castillo noted that Plaintiff had no complaints other than drowsiness, and that her mood, though

9    mildly depressed, was stable. AR 388. In August 2009, Dr. Castillo noted that Plaintiff was

10   anxious because she had lost custody of her child due to drug use,[5] but she was "more less [sic]

11   stable on medication." AR 381.  The ALJ noted that Dr. Castillo's notes indicated that Plaintiff

12   was "functioning well with limited treatment and medication."[6] AR 25.  However, shortly after

13   her August 2009 appointment, Plaintiff ended her treatment at the San Juan Health Center.  AR

14   385-392.

15       On October 15, 2009, Plaintiff began residential substance abuse rehabilitation at New

16   Hope, a rehabilitation facility. AR 479.  At her intake interview, Plaintiff expressed a desire to

17   recover from substance abuse and regain custody of her daughter.[7] AR 473-476. While residing at

18   New Hope, Plaintiff began group therapy with Nabori Monclova, MFT, and individual therapy

19   with Dorothy Lansing, LMFT. AR 583-625. She was also under the care of a psychiatrist, Dr.

20   Catalina Villa, M.D. AR 583-625. Dr. Villa diagnosed Plaintiff with bipolar disorder and

21

22   [4] Plaintiff first received prescription medication for her mental health issues from her primary care physician, Dr.
     Peter Caballes, M.D., in June 2008. AR 349. Dr. Caballes referred Plaintiff to Dr. Castillo's clinic for further
23   psychiatric treatment. AR 349.

24   [5] Plaintiff testified at the administrative hearing that she has been sober since August 12, 2009. AR 52.

25   [6] Plaintiff also attended individual and group therapy sessions from July to September 2008.  AR 329-349. On
     September 30, 2008, Plaintiff reported to a TCHHS case manager over the phone that her medications were "working
26   well" and she was "not experiencing any symptoms of her disorder." AR 328.  Plaintiff switched to another therapist
     at TCHHS from August through October 2009 but terminated her treatment to enter residential treatment at New
27   Hope. AR 422-424, 415-421.

28   [7] Plaintiff has a son and a daughter, who were fourteen and two years old, respectively, at the time of the
     administrative hearing. AR 40.

1  polysubstance dependence in remission. AR 586, 1037. Dr. Villa noted that Plaintiff responded

2  well to medication.  AR 586.

3      Plaintiff stayed at New Hope until March 2010, when she moved to her parents' home. AR

4  591. Plaintiff continued to see Ms. Lansing and Dr. Villa regularly on an out-patient basis for

5  several months thereafter. AR 837-871. During her appointments with Ms. Lansing and Dr. Villa,

6  Plaintiff reported many improvements in her mood and symptoms. *See e.g.*, AR 591-592, 610,

7  620, 843, 851, 857, 859, 871. In June 2010, Plaintiff reported that she had regained custody of her

8  daughter. AR 857. On November 9, 2010, Plaintiff reported to Dr. Villa that she was complying

9  with her medication and doing very well, and that she was "very stable" and "proud of herself."

10  AR 837.

11      Although Plaintiff did well from October 2009 through early 2011, Plaintiff missed her

12  appointments with Ms. Lansing and Dr. Villa in December 2010, January 2011, and February

13  2011. AR 836, 993-995. Finally, on March 21, 2011, Plaintiff saw Ms. Lansing and told her that

14  her medication had run out two months ago and she was having mood swings. AR 996. Plaintiff

15  saw Dr. Villa the next day and again reported that she had been without medication for a few

16  months. AR 999. However, from April through June 2011, Plaintiff again missed her

17  appointments with Dr. Villa and Ms. Lansing. AR 1002-1006. Plaintiff did not have access to

18  medication refills during this time. AR 1006. On June 22, 2011, three months after her last

19  appointment with Dr. Villa, Plaintiff presented to her with symptoms of a "mixed" episode of

20  bipolar disorder. AR 1037. Dr. Villa noted as follows: "The patient was taking lithium and Abilify

21  and was doing well in terms of mood stabilization.  She decided to discontinue lithium due to

22  weight gain and try Lamictal and Abilify. Initially she was doing okay but later on there was a

23  lack of compliance and she started having symptoms again." AR 1037.  Since Plaintiff was

24  unwilling to continue with lithium despite its effectiveness, Dr. Villa prescribed a new medication,

25  Depakote. AR 1037-1038. Plaintiff also insisted on switching to a new psychiatrist because Dr.

26  Villa confronted her regarding her lack of compliance in terms of taking prescribed medications.

27  AR 1037.

28      On July 20, 2011, Plaintiff had her first appointment with a new psychiatrist, Dr. David

Kilgore, M.D., to whom she complained of mood instability with irritability and depression. AR

1032. Dr. Kilgore diagnosed Plaintiff with bipolar disorder and polysubstance dependence in full

remission. AR 1033. Plaintiff stated that "[l]ithium was the most effective [medication] but caused

too much weight gain so she is not interested in resuming it." AR 1032. Dr. Kilgore discontinued

Depakote as Plaintiff did not find it effective and started her on another medication, Topamax, on

a trial basis. AR 1033. On August 17, 2011, she had a follow-up appointment with Dr. Kilgore and

reported that she felt she was "headed toward the right direction overall." Plaintiff explained that

even though she had "tough days," she kept "get[ing] through them" and that the "medication

help[ed] in this respect." AR 1029. Dr. Kilgore noted that Plaintiff's mood had improved, affect

was "full range," speech was "articulate," thoughts were "linear, coherent, rational," abstraction

was "excellent," intelligence was "average," concentration was "good," insight was "fair,"

judgment was "adequate." AR 1029. Finally, Dr. Kilgore noted, "We discovered that she has not

gone up on the titration of Topomax and has only been taking 50 mg total daily instead of 100 mg

as originally ordered." Plaintiff's administrative hearing was held shortly thereafter, on September

1, 2011.

## DISCUSSION

### A.  The ALJ Properly Rejected the Opinions of Drs. Prince and Kalman

Plaintiff was examined by psychologist Dr. William Prince, Psy.D., a consultative

examiner, on November 14, 2009, shortly after she commenced residential treatment at New

Hope.  AR 535-540.  Dr. Les P. Kalman, M.D., a psychiatrist, examined Plaintiff on August 19,

2011, a couple of weeks before her administrative hearing, when she had just started to see Dr.

Kilgore after a period of not keeping her appointments with Ms. Lansing and Dr. Villa and not

taking her medications. AR 1013-1021. Drs. Kalman and Prince both opined that Plaintiff would

not be able to maintain a regular work schedule.  AR 535-540,. The ALJ gave little weight their

opinions. AR 26-27. As to Dr. Prince's opinion, the ALJ noted that at the time of Dr. Prince's

examination, Plaintiff had "just started drug rehabilitation" and her "mental status improved with

treatment" over time.  AR 26.  With regard to Dr. Kalman's opinion, the ALJ stated that "the medical record shows the claimant has been non-compliant with treatment since January 2011, causing her symptoms to increase.  The medical record shows the claimant is stable when she is treatment and medication complaint."  AR 27.

The ALJ discounted the opinions of Drs. Prince and Kalman, instead relying on the opinion of Eugene Campbell, Ph.D., a state agency psychological consultant.  Dr. Campbell determined that Plaintiff could perform 2-4 step tasking and could meet the expectations and handle the "the normal stressors" of full time employment in a setting with limited public contact. AR 27, 547, 563. Ultimately, the ALJ found that Plaintiff could perform full-time work in a setting where she had only occasional contact with the public as well as with co-workers and supervisors. AR 27. As discussed below, the Court finds that the ALJ gave legally sufficient reasons for discounting the opinions of Drs. Prince and Kalman and that these reasons are supported by substantial evidence in the record as a whole.

1.  <u>Legal Standard for Discounting a Non-Treating Examiner's Opinion in Favor of a State Agency Reviewing Physician's Opinion</u>

In disability proceedings, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion is given more weight than that of a non-examining physician. *Benecke v. Barnhart*, 379 F.3d 587, 592 (9th Cir. 2004); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  If the treating or examining physician's opinion is not contradicted, it can be rejected only for clear and convincing reasons.  *Lester*, 81 F.3d at 830.  If contradicted, the opinion can only be rejected for "specific and legitimate" reasons that are supported by substantial evidence in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The opinion of a non-examining physician cannot *by itself* constitute substantial evidence to justify the rejection of the opinion of either an examining physician or a treating physician.

*Lester*, 81 F.3d at 831, citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 n. 4 (9th Cir. 1990).  However, the opinion of a non-examining physician may constitute substantial evidence if it is supported by other evidence in the record and is consistent with it.  *Andrews*, 53 F.3d at 1041, 1043; *Lester*, 81 F.3d at 830-831, citing *Magallanes v. Bowen*, 881 F.2d 747, 751–55 (9th Cir. 1989) (approving the ALJ's decision to reject the opinions of Magallanes' treating physicians because in so doing, the ALJ did not rely on the nonexamining physician's testimony *alone*); *Roberts v. Shalala*, 66 F.3d  179,184 (9th Cir. 1995) (affirming ALJ's rejection of examining psychologist's functional assessment which conflicted with non-examining medical advisor's testimony and with his own written report and test results).

The Ninth Circuit has explained that "the type of evidence and reasons that would justify rejection of an examining physician's opinion might not justify rejection of a treating physician's opinion." *Lester*, 81 F.3d at 831, n. 8.  While Ninth Circuit "cases apply the same legal standard in determining whether the Commissioner properly rejected the opinion of examining and treating doctors—neither may be rejected without 'specific and legitimate' reasons supported by substantial evidence in the record, and the uncontradicted opinion of either may only be rejected for 'clear and convincing' reasons—[they] have also recognized that the opinions of treating physicians are entitled to greater deference than those of examining physicians." *Id.* (citations omitted).  "Thus, reasons that may be sufficient to justify the rejection of an examining physician's opinion would not necessarily be sufficient to reject a treating physician's opinion. Moreover, medical evidence that would warrant rejection of an examining physician's opinion might not be substantial enough to justify rejection of a treating physician's opinion." *Id.*

Finally, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957; *also see Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

///

2.  <u>Consultative Psychological Examiner Dr. William Prince, Psy.D.</u>

Dr. William Prince, Psy.D., performed a consultative psychological examination of Plaintiff on November 14, 2009 and prepared a report documenting his findings. AR 535-540. Pursuant to his examination, Dr. Prince diagnosed Plaintiff with bipolar disorder and substance dependence. AR 539. In his functional assessment, Dr. Prince concluded, among other things, that Plaintiff had a poor ability to accept instructions from supervisors and interact with coworkers and the public, was not able to perform work activities on a consistent basis without special or additional instructions due to her mood fluctuations, had a poor ability to maintain regular attendance in the workplace and complete a normal workday, and was unable to deal with the usual stress encountered in a competitive workplace. AR 539-540. Dr. Prince believed Plaintiff's mental health condition probably would not abate within the next twelve months. AR 539-540.

In giving little weight to the opinion of Dr. Prince, the ALJ relied on the opinion of Dr. Eugene Campbell, the state agency psychological consultant, the medical record, and the overall evidence of record.  AR 27.  The ALJ discounted Dr. Prince's opinion "because [Plaintiff] had just started drug rehabilitation at this time and [Plaintiff's] mental status improved with treatment." AR 26.  The ALJ summarized the medical evidence he relied upon in great detail.  The Court finds that the ALJ provided a specific and legitimate reason, supported by substantial evidence in the record as a whole, for discounting Dr. Prince's opinion.  District courts have held that an ALJ's conclusion, supported by substantial evidence in the record, that a claimant's symptoms improved and stabilized with treatment counts as a specific and legitimate reason to discount a doctor's opinion. *See e.g.*, *Lawson v. Colvin*, 2013 U.S. Dist. LEXIS 165995, *24-25 (W.D. Wash. Sept. 13, 2013) (the ALJ reasonably concluded that a doctor's opinion was "inconsistent with the record as a whole, which indicated that the claimant's mood improved and stabilized with treatment"); *Cox v. Astrue*, 2012 U.S. Dist. LEXIS 125891, *15, 17 (D. Or. Sept. 5, 2012) (the ALJ's reliance on a doctor's notes showing that a claimant improved after the doctor gave his opinion, was a specific and legitimate reason to reject the doctor's opinion).

Plaintiff argues that the ALJ's reasoning is an inappropriate, unqualified medical judgment, and, further, that the reasoning is unsupported by the record because Plaintiff continued

1  to struggle with psychological issues upon completion of her inpatient treatment at a drug

2  rehabilitation facility.[8] Doc. 15, 9:8-11, 9:22-10:2. The Commissioner responds that the evidence

3  shows that Plaintiff's condition improved over time with sustained mental health and substance

4  abuse treatment and that the ALJ's reliance on that evidence was proper. Doc. 16, 6:21-28.

5        The ALJ's conclusion that Plaintiff's mental condition improved with treatment after Dr.

6  Prince's examination is a reasonable inference based on the records of Plaintiff's treating sources

7  (whose opinions are entitled to more weight than examining sources). *See Macri v. Chater*, 93

8  F.3d 540, 544 (9th Cir. 1996) (*citing Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (the

9  ALJ is entitled to draw inferences "logically flowing from the evidence")). At the time of Dr.

10 Prince's examination, Plaintiff had recently entered residential rehabilitation at New Hope. AR

11 535, 628. As noted above, Plaintiff underwent regular group and individual therapy and was under

12 the care of a psychiatrist at New Hope. AR 583-625. While Plaintiff was not entirely symptom-

13 free during this period, the ALJ's conclusion that Plaintiff's mental condition improved

14 substantially when she received regular treatment is supported by substantial evidence.[9] For

15 example, after Plaintiff's treating psychiatrist at New Hope, Dr. Villa, adjusted her medications

16 over November-December 2009, Plaintiff reported that she was doing a lot better, denied

17 depressive symptoms, and was "very happy" with her medication. AR 610, 612, 620.

18        After completing the residential component of her treatment at New Hope in March 2010,

19 Plaintiff continued to improve overall. Although Plaintiff had mild depressive symptoms when she

20 presented to Dr. Villa in July and September 2010, she frequently reported feeling better and

21 experienced mood improvement and stability during the period from April 2010 to November

22 2010. AR 854, 847, 837-871. For example, in April 2010, Plaintiff's mood was stable and she was

23 not experiencing manic or depressive symptoms. AR 871. In May 2010, Plaintiff's mood was very

24

25 ─────────────────────────
[8] Plaintiff also argues in her Reply Brief that improvement or sustained remission of Plaintiff's substance abuse
condition is not determinative of functional capacity, which was based on Plaintiff's mental condition. Doc. 19, 3:9-
12. However, Plaintiff's argument is misplaced because the ALJ reasoned that Plaintiff's "mental status improved
26 with treatment" of both her substance dependence and mental health issues.  AR 26.

27 [9] Plaintiff argues that her symptoms resurfaced when she left the residential program in February 2010. Doc 15, 10:1-
2. However, in February 2010, Plaintiff was still in residential treatment and Dr. Villa's notes indicate that her mood
was "fine" although she had "some depressive symptoms." AR 598. Moreover, when Plaintiff left New Hope in
28 March 2010, her mood was "fine" and she reported "mood swings that are not severe." AR 591.

stable and she denied manic or depressive symptoms. AR 859. In June 2010, Plaintiff continued to

deny manic or depressive symptoms. AR 857. In August 2010, Plaintiff again denied manic or

depressive symptoms and said she was feeling very well with her current medication and was not

experiencing mood swings. AR 851. In October 2010, Plaintiff felt better about the mild

depressive symptoms she experienced in September 2010. AR 843. In October 2010, she was near

the end of the out-patient part of New Hope's program and had no concerns about potential

triggers for substance abuse. AR 843. In November 2010, Plaintiff reported no symptoms; she said

she was doing very well, was stable, and proud of herself. AR 837. In contrast to Dr. Prince's

assessment that Plaintiff's mental condition would not abate in twelve months, the record shows

that her condition improved significantly over the subsequent twelve months. AR 539. Therefore,

based on the medical record, it was reasonable for the ALJ to conclude that despite occasional

reports of mild depression, Plaintiff's condition improved with treatment. In sum, the ALJ

provided legally sufficient reasons, supported by substantial evidence in the record, for

discounting Dr. Prince's opinion.

### 3. Examining Psychiatrist, Dr. Les P. Kalman, M.D.

Examining psychiatrist, Dr. Les P. Kalman, M.D., conducted a psychiatric examination of

Plaintiff on August 19, 2011, about two weeks before her administrative hearing and prepared a

report documenting his findings. AR 1008-1012. Pursuant to his examination, Dr. Kalman

diagnosed Plaintiff with schizoaffective disorder – bipolar type and post-traumatic stress disorder.

AR 1012. With regards to Plaintiff's functional limitations, Dr. Kalman noted that Plaintiff was

markedly limited in her ability to work in coordination or proximity to others without being

distracted by them and she was incapable of handling even low stress. AR 1017, 1020. Dr.

Kalman also estimated that Plaintiff was likely to be absent from work more than three times a

month as a result of her impairments or treatment. AR 1021.

The ALJ considered Dr. Kalman's opinion but gave it little weight "because the medical

record shows [Plaintiff] has been non-compliant with treatment since January 2011, causing her

symptoms to increase" and "[t]he medical record shows [Plaintiff] is stable when she is treatment

and medication compliant." AR 27. Plaintiff argues that the ALJ's reasoning is not supported by

1    substantial evidence because the record reveals that at times Plaintiff was not stable despite being

2    treatment and medication compliant.[10] Doc. 15, 10:21-11:3. The Commissioner responds that the

3    ALJ properly discounted Dr. Kalman's opinion.  Doc. 16, 8:1-6, 8:23-25.

4         As discussed above, there is substantial evidence in the record to support the ALJ's

5    conclusion that Plaintiff was stable when sober and compliant with her treatment and medication

6    regimens. Plaintiff did well when she received regular treatment at New Hope and continued to do

7    well for close to a year after she left New Hope, when she regularly participated in its out-patient

8    treatment program and complied with her prescribed medication regimen. The record also shows

9    that Plaintiff deteriorated in the spring of 2011 when she missed her mental health appointments

10   and stopped taking her medication. AR 836, 993-995. Indeed, she started to see Dr. Kilgore in July

11   2011 after months of lack of compliance with treatment and medication.[11] *See* AR 999, 1003,

12   1005-1006, 1037, 1032, 1028.  Thus, Plaintiff had barely returned to regular treatment when she

13   was examined by Dr. Kalman in August 2011, and the ALJ properly considered Plaintiff's longer-

14   term medical history in discounting Dr. Kalman's opinion. AR 993-1006. In sum, the ALJ

15   provided specific and legitimate reasons, supported by substantial evidence in the record as whole,

16   for discounting Dr. Kalman's opinion and relying instead on the contrary opinion of Dr. Campbell.

17   *See Warre v. Comm'r of Soc. Sec*., 439 F.3d 1001, 1006 (9th Cir. 2006)("Impairments that can be

18   controlled effectively with medication are not disabling for the purpose of determining eligibility

19   for SSI benefits.").

20        Plaintiff argues that Dr. Kilgore noted in July 2011 that Plaintiff's medications were not

21   effectively treating her symptoms and that she reported problems with anger, irritability, paranoia,

22   and anxiety. Doc. 15, 10:6-9. However, Plaintiff had recently stopped taking lithium, which had

23   been the most effective medication for her symptoms, and switched to Depakote on account of the

24   weight gain caused by the lithium.  1037-1038.  Indeed, Dr. Kilgore specifically noted that

25

26   [10] Plaintiff also argues that the ALJ may not draw inferences about Plaintiff's symptoms from a failure to seek
     treatment. Doc. 15, 11:4-5. However, the ALJ is simply contextualizing Dr. Kalman's evaluation of Plaintiff and not

27   drawing inferences about Plaintiff's symptoms at the time she presented to Dr. Kalman.

28   [11] Further, it appears that Dr. Kalman did not accurately consider Plaintiff's treatment history in rendering his opinion,
     because he incorrectly notes that Plaintiff had been seeing Dr. Kilgore on a monthly basis since 2009. AR 1009.

1   Plaintiff "reports symptoms *when not on medication* of anger, irritability, paranoia and anxiety."

2   AR 1032 (emphasis added).  Dr. Kilgore discontinued Depakote in favor of Topamax at Plaintiff's

3   first appointment with him in July 2011. AR 1032. At Plaintiff's next appointment in August

4   2011, she stated that her mood was "a little better" and felt she was headed in the right direction

5   overall. AR 1029. Dr. Kilgore mental status examination at that appointment also revealed that

6   Plaintiff was doing well.  AR 10-29.  Thus the ALJ properly discounted Dr. Kalman's opinion as

7   it was rendered after Plaintiff had not complied with her treatment and medication requirements

8   for months and was finally getting back on track under treatment with Dr. Kilgore.

9                      **2.   The ALJ Properly Discounted Plaintiff's Subjective Complaints**

10         The ALJ found that Plaintiff's statements concerning her symptoms were not fully

11  credible. AR 24, 25, 27. The ALJ based her credibility determination on her findings that (1)

12  Plaintiff's treating sources indicated that her condition is stable when she is sober and compliant

13  with her treatment and medication; (2) Plaintiff's work history has always been sporadic and

14  inconsistent; and (3) Plaintiff's daily activities indicate that she is able to work. As explained

15  below, the Court finds that the ALJ's credibility determination is based on correct legal standards

16  and is supported by substantial evidence in the record as a whole.

17         A.   The ALJ's Credibility Determination

18         In her disability determination, the ALJ found that Plaintiff had an underlying medical

19  impairment that could reasonably be expected to produce the symptoms alleged, but that

20  Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms

21  were not credible to the extent that they were inconsistent with her finding that Plaintiff could

22  perform full-time work at any exertional level, but was limited to simple and routine tasks with

23  occasional contact with coworkers, supervisors, and the public. AR 24, 25, 27. Plaintiff argues that

24  the ALJ's credibility finding is not supported by substantial evidence because her symptoms were

25  not effectively controlled with medication, her work history was consistent, and her daily activities

26  are not necessarily transferable to a work setting. Doc. 19, 8:14-18; Doc. 15, 16:18-18:7.  The

27  Commissioner responds that the ALJ's credibility finding is supported by the record because

28  Plaintiff's treatment was effective, her work history fluctuated, and her daily activities were

1   inconsistent with her claims of confusion and social problems. Doc. 16, 11:21-12:25.

2         B.   Legal Standard

3         In evaluating the credibility of a claimant's testimony regarding subjective symptom

4   complaints, an ALJ must determine whether the claimant has presented objective medical

5   evidence of an underlying impairment that could reasonably be expected to produce the symptoms

6   alleged, and, if there is no evidence of malingering, the ALJ can only reject the claimant's

7   testimony regarding the severity of the symptoms if she gives "specific, clear and convincing

8   reasons" for the rejection.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).

9         Regarding credibility determinations by an ALJ, the Ninth Circuit has held as follows:

10        The ALJ may consider many factors in weighing a claimant's credibility, including (1)
          ordinary techniques of credibility evaluation, such as the claimant's reputation for lying,
11        prior inconsistent statements concerning the symptoms, and other testimony by the
          claimant that appears less than candid; (2) unexplained or inadequately explained failure
12        to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily
          activities.  If the ALJ's finding is supported by substantial evidence, the court may not
13        engage in second-guessing.

14   *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks

15   omitted); *see also Bray v. Comm'r of Soc. Sec. Admin*., 554 F.3d 1219, 1226–27 (9th Cir. 2009);

16   20 C.F.R. §§ 404.1529, 416.929; Social Security Ruling ("SSR") 96-7p, available at 1996 WL

17   374186.  Other factors the ALJ may consider include a claimant's work record and testimony from

18   physicians and third parties concerning the nature, severity, and effect of the symptoms of which

19   he or she complains.  *Light v. Soc. Sec. Admin*., 119 F.3d 789, 792 (9th Cir. 1997).

20        C.   Plaintiff's Symptoms When Treatment and Medication Compliant

21        In making her credibility determination, the ALJ properly relied on statements regarding

22   Plaintiff's symptoms made by Plaintiff's treating sources, Dr. Castillo, Dr. Villa, and Ms. Lansing,

23   which indicate that Plaintiff's symptoms were controlled by medication. *See Light*, 119 F.3d at

24   792 (in evaluating credibility, the ALJ may consider testimony from physicians and third parties

25   concerning the nature, severity, and effect of the symptoms of which the claimant complains); *see*

26   *also Warre v. Comm'r of Soc. Sec*., 439 F.3d 1001, 1006 (9th Cir. 2006)("Impairments that can be

27   controlled effectively with medication are not disabling for the purpose of determining eligibility

28

1    for SSI benefits.").

2         Here, the ALJ found that Plaintiff's mental condition was stable when she complied with

3    the treatment protocol for her substance abuse problems and with her medications. AR 27. The

4    ALJ's finding is supported by the statements of her treating physicians regarding her symptoms.

5    For example, Dr. Castillo specifically stated in March 2009 that Plaintiff is "more less [sic] stable

6    on medication." AR 381. Dr. Villa also wrote in November 2011 that "[Plaintiff] is being

7    compliant with the medication. Her mood is very stable." AR 837. She also wrote "[Plaintiff] is

8    doing very well with the medication." AR 837. At the time Plaintiff testified at the hearing, she

9    had not been compliant with her treatment and medication. In fact, Plaintiff had only begun

10   regular treatment with Dr. Kilgore a month before the hearing. AR 36, 993-995, 1002-1006, 1032.

11   Therefore, the ALJ reasonably discounted her subjective symptom testimony in light of other

12   evidence in the record that Plaintiff's symptoms could be controlled with ongoing treatment and

13   medication. The ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony,

14   and the ALJ's analysis is supported by substantial evidence in the record.

15        D.  Plaintiff's Work History

16        The ALJ properly considered Plaintiff's work history as a factor in making her credibility

17   determination. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (the ALJ's finding that

18   the plaintiff had an "extremely poor work history" was a specific, clear and convincing reason for

19   discounting her testimony). Further, the ALJ's conclusion that Plaintiff had an inconsistent work

20   history is supported by substantial evidence in the record. Plaintiff wrote in her "Work History

21   Report" and her "Disability Report" that she had worked in customer service from 1994-1996 and

22   "on and off" in the fast food industry from 1997-2003. AR 244, 236. Plaintiff testified at the

23   hearing that she worked at a fast food chain on and off for about seven years, during which she

24   was fired and re-hired about three times. AR 45. She did not elaborate as to the reasons for the

25   firing and re-hiring. *See* AR 45. From February 2002 through April 2005, Plaintiff worked as a

26   data transcriber for the IRS on a seasonal basis. AR 244, 236. Additionally, the Disability Insured

27   Status Calculator shows that her earnings fluctuated substantially year to year. AR 224-225.

28        Plaintiff argues that the ALJ's interpretation of Plaintiff's work history is unsupported by

1  the record which does not reflect little propensity to work but rather demonstrates that Plaintiff has

2  been employed consistently since she was seventeen years old. Doc. 15, 16:18-28; Doc. 19, 8:25-

3  9:2. Although there is some merit to Plaintiff's argument, based on the record the ALJ could

4  reasonably find that Plaintiff's work history is inconsistent, which, in turn, negatively affects her

5  credibility regarding her disabling symptoms.  If the ALJ's finding is supported by substantial

6  evidence, the court may not engage in second-guessing. *Tommasetti*, 533 F.3d at 1039. Hence, the

7  Court concludes that the ALJ reliance on Plaintiff's inconsistent work history in discounting her

8  credibility is not legally erroneous and is supported by substantial evidence.

9        E.  <u>Plaintiff's Daily Activities</u>

10        The ALJ also properly considered Plaintiff's daily activities as a factor in making her

11  credibility determination. *See Light*, *supra*, 119 F.3d at 792 (in evaluating credibility, the ALJ may

12  consider inconsistencies between the claimant's testimony and her daily activities); *Fair v. Bowen*,

13  885 F.2d 597, 603 (9th Cir. 1989) (the ALJ may rely on testimony about the claimant's daily

14  activities to find a symptom allegation incredible). "[M]any home activities are not easily

15  transferable to what may be the more grueling environment of the workplace," however, "if,

16  despite his claims of pain, a claimant is able to perform household chores and other activities that

17  involve many of the same physical tasks as a particular type of job, it would not be farfetched for

18  an ALJ to conclude that the claimant's pain does not prevent the claimant from working." *Fair*,

19  885 F.2d at 602, 603. Here, the ALJ properly relied on Plaintiff's testimony regarding her typical

20  daily activities to conclude that her allegations of utterly disabling symptoms were not fully

21  credible.

22        At the administrative hearing, Plaintiff testified that she completed high school, attended

23  classes at a junior college, has a driver's license, drives, has worked on and off, and has a history

24  of substance abuse but has been clean and sober for the last two years.  AR 41, 52.  She further

25  testified as to her typical daily activities. AR 41-45. On a typical day, Plaintiff sets an alarm to

26  wake up early and help her teenage son get ready for school. AR 42. She leaves the house early to

27  pick up her nephew and drop both her son and her nephew off at their respective schools. AR 43.

28  She goes back home and attends to her daughter's needs such as feeding, bathing, changing her

diaper, and dressing. AR 43. She and her daughter watch some TV together, and Plaintiff does chores such as laundry, taking out the trash, and cleaning up after her children, and sometimes she calls a friend on the phone. AR 42-43. Plaintiff usually takes a one-to-two-hour nap with her daughter because her medications make her a bit drowsy. AR 44. Plaintiff picks up her son and nephew in the afternoon, and helps her son with his homework and helps her mother make dinner in the evening. AR 44. Plaintiff sets the table and the family has dinner together. AR 44. Plaintiff and her family may watch some TV in the evening before she gets her daughter ready for bed. AR 45. Occasionally, Plaintiff has to be reminded to change clothes or take a shower or be woken up to pick up her son. AR 41, 44.

With regard to social anxiety, Plaintiff explained that she has difficulty establishing and maintaining intimate social relationships with others, including her close family members and members of the four different support groups she attends. AR 49-50, 42. She testified that her children are the only ones with whom she can maintain relationships. AR 49. Plaintiff testified that she loves her children, and that if it were not for the need to care for her daughter, she would not be able to pull herself out of bed. AR 49.   However, Plaintiff also testified that she regularly interacts on a less-intimate basis with the members of her various support groups. AR 49-50. She testified that she has friends that she calls on the telephone during the day and that she has substantial contact with her parents at home. AR 43, 44. In finding that the Plaintiff could perform jobs requiring simple, repetitive tasks and only  occasional contact with supervisors, coworkers, and the public, the ALJ reasonably discounted Plaintiff's allegations of disabling symptoms on the basis of her daily activities.

In sum, the ALJ gave specific, clear and convincing reasons, which were supported by substantial evidence in the record, to reject Plaintiff's allegations of totally disabling symptoms. Therefore, the ALJ's credibility determination is without legal error and supported by substantial evidence in the record.

///

///

///

17

### 3.   The ALJ Properly Relied on the VE's Testimony

The ALJ relied on VE testimony in finding that Plaintiff can perform jobs that exist in significant numbers in the national economy. AR 28. The VE misstated the DOT numbers associated with some of the occupations she referenced. AR 58-59. However, the VE's mistake did not create a substantive conflict between her testimony and the DOT that the ALJ was required to expressly resolve. Accordingly, the ALJ properly relied on the VE's testimony.

A.   The VE's Testimony at the Administrative Hearing

At the administrative hearing, the ALJ questioned the VE about the availability of jobs that a hypothetical person, who had the same RFC and background characteristics as Plaintiff, could perform.  Initially, the ALJ posited that the hypothetical question would be restricted to simple, routine tasks with occasional contact with the public. AR 58. The VE testified that such a person could not perform Plaintiff's past relevant work but could work as a kitchen helper, cook's helper and box bender.  AR 58-59.  The ALJ then added a further restriction to the hypothetical, specifically that the person in question could have only occasional contact with coworkers and supervisors.  AR 59.  The VE responded that someone with all these restrictions could work as an industrial cleaner.  The VE stated that there were 107,000 industrial cleaner jobs in the California economy but eroded that number by 50 percent to accommodate the restriction of occasional contact with the public, coworkers, and supervisors, leaving 53,500 such jobs in California.  AR 59.  The VE identified a DOT number of 381.687-010 for this occupation.  The VE stated that someone with the restrictions identified by the ALJ could also perform production work such as box bender jobs.  The VE testified that although 18,000 box bender jobs existed in the state of California and 162,000 in the nation, she eroded that number by 50 percent on account of the applicable non-exertional limitations identified by the ALJ, leaving 9,000 jobs in California and 81,00 jobs nationwide.  AR 59.  The VE said the DOT number for this occupation was 641.687.010.  Finally, the VE stated that a hypothetical person with all the non-exertional restrictions identified by the ALJ could work in a material handling occupation and identified a DOT number of 727.687-030 for a job within this occupational classification.  AR 60.  To accommodate the applicable non-exertional limitations, the VE applied a two-thirds erosion to the

number of such jobs that were available, concluding that 20,000 applicable jobs existed in California.  AR 60.

At the end of the VE's testimony, the ALJ asked whether her testimony was consistent with the DOT.  AR 63.  The VE responded affirmatively.  AR 63.  Based on the VE's testimony, the ALJ concluded at step 5 of the sequential disability analysis that Plaintiff was not disabled because she could perform work that existed in significant numbers in the national and regional economies, specifically as an industrial cleaner; production worker, i.e., box bender; and material handler.  AR 28-29.

Plaintiff argues that the VE misstated the DOT numbers associated with the "industrial cleaner" and "material handler" occupational classifications and that this discrepancy constitutes a substantive conflict between the VE's testimony and the DOT's occupational data, which should have been specifically resolved by the ALJ. [12]  Doc. 15, 14:6-8.  Plaintiff also argues that the discrepancies in the DOT numbers provided by the VE creates confusion regarding which jobs were actually contemplated by the VE and relied upon by the ALJ.  Doc. 19, 7:25-27.  The Commissioner responds that the minor mischaracterization of the DOT numbers associated with the specific jobs identified by the VE does not amount to a substantive deviation from the DOT and should accordingly be construed as harmless error.  Doc. 16, 10:5-6.

B.  Applicable Law

A claimant who can engage in work that exists in the national economy is not disabled. The Commissioner must demonstrate that the claimant can perform jobs that exist "in significant numbers either in the region where such individual lives or in several regions of the country." [13] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d

---

[12] The DOT number for industrial cleaner is 381.687-01 8, whereas the VE testified that it was 381.687-01 0, and the DOT number for material handler is 9 29.687-030, whereas the VE testified that it was 7 27.687-030.

[13] This determination is made at the fifth step of the five-step sequential evaluation. 20 C.F.R. § 404.1520(a)(4)(v).

519, 523–25 (9th Cir. 2014).  "The burden of establishing that there exists other work in significant numbers"—either nationally or regionally—"lies with the Commissioner."  *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).  If a reviewing court finds the number of jobs at either the regional or national level significant, the ALJ's decision must be upheld.  *Id*. at 390.  There is no "bright-line rule for what constitutes a significant number of jobs" in a region or in the national economy.  *Id.* at 389.

An ALJ properly relies on a VE's "testimony regarding the number of relevant jobs in the national economy."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("An ALJ may take administrative notice of any reliable job information, including information provided by a VE.").  "A VE's recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is required."  *Id.*

An ALJ's determination that jobs that a claimant can perform exist in significant numbers in the regional or national economy must be supported by substantial evidence.  The "substantial evidence" standard involves a quantum of proof that is "more than a mere scintilla but less than a preponderance" of the evidence presented to the adjudicator.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is such that "a reasonable mind might accept as adequate to support a conclusion."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  A reasonable mind need not accept obvious errors in a VE's testimony that lead to implausible results.  *See Farias v. Colvin*, 519 F. App'x 439, 440 (9th Cir. 2013) ("A reasonable mind would not accept the VE's testimony that there are 3,600 head dance hall hostess positions in the local economy and 342,000 in the national economy.").  Moreover, a reviewing court should "weigh both the evidence that supports and the evidence that detracts from the ALJ's factual conclusions."  *Gutierrez*, 740 F.3d at 523.

In testifying at a social security administrative hearing, the VE references the DOT in evaluating whether the claimant is able to perform other work in the national economy.  *Terry v.*

*Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990) (citations omitted); *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995); *see also* 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1) (DOT is source of reliable job information).  In fact, the Social Security Administration relies on the DOT as the presumptive authority on job classifications.  *Johnson*, 60 F.3d at 1435; SSR 00-4p, 2000 SSR LEXIS 8 ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.").  Accordingly, an ALJ is required to identify any conflicts between occupational evidence provided by a VE and occupational information included in the DOT.  SSR 00-4p.

SSR 00–4p states that "[w]hen a [vocational expert] ... provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert] ... evidence and information provided in the [Dictionary of Occupational Titles]."  SSR 00–4p further provides that the adjudicator "will ask" the vocational expert "if the evidence he or she has provided" is consistent with the Dictionary of Occupational Titles and obtain a reasonable explanation for any apparent conflict.  *Massachi v. Astrue*, 486 F.3d 1149, 1152–53 (9th Cir. 2007) (alterations in original).  When vocational evidence provided by a VE is not consistent with information in the DOT, the ALJ "must resolve this conflict before relying on the [VE evidence] to support a determination or decision that the individual is or is not disabled."  SSR 00-4p; *Massachi*, 486 F.3d at 1153.

C.  Analysis

Here, the ALJ met her affirmative duty to inquire as to whether there was a conflict between the VE's testimony and the information provided in the DOT and the VE answered in the negative. [14]  AR 63.  Furthermore, the ALJ properly relied on the VE's testimony despite the fact

---

[14] A conflict between VE testimony and the DOT most commonly exists when the VE states that an occupation has a different exertional level than defined by the DOT. *See* SSR 00-4; *see also, Johnson v. Shalala,* 60 F.3d 1428, 1435 (9th Cir. 1995) (the VE stated that some office helper positions existed that could be classified as "sedentary," while the DOT described office helper as "light work"); *Farias v. Colvin,* 519 Fed. Appx. 439, 440 (9th Cir. 2013) (the VE

1    that the VE misstated the DOT numbers associated with the some of the applicable occupations

2    she identified, as the VE's minor numerical mistake does not amount to a substantive conflict with

3    the DOT's occupational data about the jobs in question.[15]

4         When discussing "industrial cleaner" jobs, the VE gave the DOT number for "central-

5    supply worker." AR 59. In other words, the VE provided the DOT number 381.687-010 (which

6    corresponds to "central-supply worker") when the correct DOT number for industrial cleaner is

7    381.687-018. The VE, however, specifically identified the applicable jobs as "industrial cleaner"

8    jobs. AR 59 ("we have cleaners, industrial cleaners"). Therefore, the minor discrepancy in the

9

10   DOT number provided by the VE amounts to a harmless error rather than a substantive conflict

11   with the DOT's occupational data for industrial cleaner jobs. The VE also testified that a

12   hypothetical person with the Plaintiff's limitations could perform production work such as "box

13   bender" jobs. The VE identified the correct DOT number for the "box bender" occupation, i.e.,

14   641.687-010.[16] Finally, the VE testified that "material handler" jobs were also an option for a

15   hypothetical person with Plaintiff's limitations. When discussing "material handler" jobs the VE

16   provided a DOT number, 727.687-030, that corresponded with "battery stacker" jobs. It is

17

18   possible the VE was talking about material handler jobs generally and provided the DOT number

19   for one of these jobs, i.e., "battery stacker." AR 59-60. In any event, the VE's testimony

20   stated that a ticket taker job has occasional handling requirements and no fingering requirements, but the DOT stated

21   that a ticket taker job has frequent handling and occasional fingering requirements). This type of conflict is not at
     issue in the instant matter.

22   [15] A mis-identified DOT number does not amount to a conflict between ta VE's testimony and the DOT that must be
     resolved by the ALJ. *See Castro v. Astrue*, 2011 WL 3500995, at *11, n. 4, 2011 U.S. Dist. LEXIS 87705, at *33, n. 4

23   (E.D. Cal. Aug. 9, 2011). In *Castro*, the VE's mischaracterization of the DOT number associated with "loader of
     semi-conductor dies" was not treated as a conflict. *Id*. The VE identified the job classification of "loader of semi-

24   conductor dies" but provided the DOT number for the job category of "plug wirer." *Id*. The district court relied on the
     job title provided by the VE, i.e., "loader of semi-conductor dies," noting in passing that the VE simply made a

25   mistake as to the DOT number associated with the job classification she had in mind. *Id*.

26   [16] Plaintiff argues that the VE gave one DOT number to correspond to the jobs "box bender" and "production
     worker." Doc. 15, 13:12-25. However, it is clear from the VE testimony that the VE intended to indicate "box

27   bender." The VE first refers to box bender as "working in a factory setting" and states that there are 18,000 jobs in
     California. AR 59. Then the VE explicitly refers to this example again, calling it "production work" and notes the

28   same number of existing jobs. Further, there is no "production worker" title in the DOT.

regarding the availability of industrial cleaner and box bender jobs that Plaintiff could perform

constitutes substantial evidence to support the ALJ's step 5 determination.[17]  *See, e.g.*, *Bayliss v.*

*Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the

necessary foundation for his or her testimony.  Thus, no additional foundation is required.").

**CONCLUSION**

For the foregoing reasons, the Court finds that the ALJ's decision is free of legal error and

is supported by substantial evidence in the record as a whole.  Accordingly, this Court DENIES

Plaintiff's appeal from the administrative decision of the Acting Commissioner of Social Security.

The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W.

Colvin, the Acting Commissioner of Social Security, and against Plaintiff Valerie A. Nino.

IT IS SO ORDERED.

Dated:   **June 15, 2015**                    **/s/ Gary S. Austin**
                                                          UNITED STATES MAGISTRATE JUDGE

---

[17] The ALJ is not required to identify specific jobs at step 5 of the disability analysis.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1176 (9th Cir. 2008) (the VE's testimony that the claimant could perform a number of jobs within assembly or sorting occupations  was "sufficiently specific to identify jobs that match [the claimant's] abilities").